UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SYLVESTER WRIGHT                                                           PLAINTIFF

V.                                                    CIVIL ACTION NO. 3:11CV760 DPJ-FKB

CUSTOM ECOLOGY, INC AND
GEORGE LOCKART                                                           DEFENDANTS

ORDER

This employment-discrimination action is before the Court on motion of Defendants Custom Ecology, Inc. and George Lockart for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff Sylvester Wright has responded in opposition. The Court, having considered the memoranda and submissions of the parties, along with the pertinent authorities, finds that Defendants' motion should be granted.

I.  Facts

Custom Ecology, Inc. (CEI) is an industrial and hazardous waste transporting company. Plaintiff Sylvester Wright worked for CEI and its predecessor for seventeen years, loading trucks with garbage for transport to a landfill. In this lawsuit, Wright, a 55-year old African-American, alleges that his termination was motivated by his race, age, and prior complaints about workplace discrimination. CEI counters that Wright was fired for insubordination and describes three incidents which led up to his dismissal.

First, on September 6, 2010, Wright and a white co-worker named Ricky Cole got into an argument. Cole shoved Wright. Cole immediately reported the incident to their supervisor John Provost, who attempted to contact Wright on his company cell phone without success. At the end of the workday, Wright called Provost and told him he had been to the emergency room,

would return to work the next day, and had reported the incident to Waste Management.[1]
Provost considered Wright's failure to contact him immediately after the incident a disciplinary violation and suspended him for one day. Provost suspended Cole–the aggressor–for two days.

The second and third incidents involved insubordination and occurred approximately one month later. Both occurrences stemmed from Provost's hiring of David Hughes, who is white, to operate a track hoe in the yard and back-up Wright in his loading duties. Previously, Willie Miller, an African-American who worked as a handyman for CEI, backed-up Wright. Provost did not view the reassignment of duties as a demotion for Miller, but Wright did and complained about it to Provost. On October 11, Provost cited Wright for "Insubordination - Refusing to Accept Supervisor[']s Instruction" and gave him a written warning. Disciplinary Report [36-7]. Approximately ten days later, Provost learned that Wright continued to talk about the decision with co-workers in the yard. *Id.* Viewing this as an attempt to undermine his authority, Provost documented a third disciplinary action on October 21 and fired Wright for insubordination. *Id.*

Wright insists his conduct was not grounds for dismissal. He contends that he was "unlawfully suspended" for seeking medical treatment before informing Provost of the altercation. Compl. ¶¶ 10, 11. And he maintains that Miller was demoted due to his race and claims that his own complaints to Provost protested "unlawful treatment." *Id.* ¶ 13. Wright explains that prior to these incidents he had no problems in the workplace and met CEI's expectations. But when he complained about his own suspension and Miller's loss of responsibilities, CEI retaliated by firing him. Wright suggests that CEI retained younger, white

---

[1] It is unclear from the record the relationship between Waste Management and CEI or why Wright reported the incident to this entity. Nevertheless, it is undisputed that Wright notified Waste Management before notifying Provost. Wright Dep. [36-2] at 40.

employees who engaged in similar conduct and characterizes CEI's decision as unlawful and against company policy.

Following his termination, Wright sought unemployment benefits through the Mississippi Department of Employment Security (MDES)[2] and filed a complaint with the Equal Employment Opportunity Commission. After receipt of his Notice of Right to Sue, he filed this suit alleging retaliation, race and age discrimination in violation of Title VII, and various state-law claims, including wrongful discharge, tortious breach of contract, and intentional infliction of emotional distress. Defendants moved for summary judgment as to all claims.[3] The Court has subject matter jurisdiction and is prepared to rule.

II. Summary Judgment Standard

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it

---

[2] MDES was previously called the Mississippi Employment Security Commission (MESC), and Plaintiff refers to the MESC throughout his filings.

[3] Plaintiff sued both CEI and its owner George Lockhart. Because the Court finds that summary judgment should be granted as to all of Plaintiff's claims, it is unnecessary to reach Defendants' separate arguments that Lockhart is not individually liable, thought that would certainly be true as to any Title VII claims.

believes demonstrate the absence of a genuine issue of material fact ." *Id.* at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little*, 37 F.3d at 1075*; SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1994); .

III. Analysis

    A. Race and Age Discrimination

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Likewise, the Age Discrimination in Employment Act (ADEA) prohibits discrimination in the workplace based on age and protects workers over the age of forty (40). 29 U.S.C. § 623. Both race and age discrimination claims follow the *McDonnell–Douglas* burden-shifting analysis.

The plaintiff must first establish a prima facie case of discrimination by showing (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the

4

subject of an adverse employment action, and (4) he was replaced by someone outside the protected class, or in the case of disparate treatment, he was treated less favorably than similarly situated employees under nearly identical circumstances. *See Lee v. Kan. City S. Ry.*, 574 F.3d 253, 259 (5th Cir. 2009); *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001); *see also McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Lee*, 574 F.3d at 259. Once that burden is met, to prevail on a race discrimination claim, the plaintiff must offer evidence to show "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive alternative)." *Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004). The ADEA does not permit the mixed-motive alternative, so the plaintiff "must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009); *see also Davis v. Farmers Ins. Exch.*, 372 F. App'x 517, 519 (5th Cir. 2010).

    1.    Disparate Discipline

Initially, CEI gathered that Wright was only asserting a discriminatory-discharge claim and conceded to satisfaction of a prima facie case. But in his Response, Wright discussed claims of disparate discipline stemming from his suspension and termination. In Reply, CEI addressed those claims and argued that Wright had not alleged a proper comparator. The Court agrees.[4]

---

[4] Usually, "[i]t is the practice of . . . the district courts to refuse to consider arguments raised for the first time in reply briefs." *Gillaspy v. Dallas Indep. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. 2008) (citation omitted). But, it is well-established that Plaintiff must set forth a

5

To constitute disparate discipline, "the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Lee*, 574 F.3d at 260. "If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)).

First, Wright argues that he was treated differently than Cole, the white employee who was the aggressor in the yard altercation.[5] But Wright cannot make out a prima facie case of race or age discrimination because the evidence shows Cole received a more severe sanction and engaged in dissimilar conduct. Cole suffered a two-day suspension for fighting; CEI suspended Wright for one day for failing to immediately report the incident—something Cole did. Provost Aff. [36-3] at 2. In addition, Wright and Cole held different positions in the company—Wright was a yard supervisor and Cole was a truck driver. *Id.*

Second, Wright mentions that Hughes was treated more favorably when he was not disciplined for sleeping on the job, while Wright was written up and ultimately discharged for insubordination. Wright merely speculates that Hughes was not disciplined; he has not presented

---

proper comparator to proceed on a disparate-discipline case, and Plaintiff addressed the issue in response. Thus, the Court believes it is appropriate under the circumstances to address the prima facie case.

[5] Cole is also over the age of 40, but a plaintiff can make out a prima facie case of age discrimination by showing he was treated less favorably than someone outside the protected class or someone younger. *See Evans v. City of Houston*, 246 F.3d 344, 350 (5th Cir. 2001). It is undisputed Wright was 55 years of age at the time of the incident.

any evidence to support this theory. And CEI points to the testimony of Miller, who explained that he told Provost that Hughes was sleeping on the job, and Provost went over to Hughes, "got him off the tractor, [and] took him in the office . . . ." Miller did not know what happened next. Pl.'s Resp., Miller Dep. [41-2] at 28–29. Even assuming Hughes was not reprimanded, the conduct is dissimilar. Wright accuses Hughes of sleeping on the job; Provost determined that Wright had openly challenged his hiring of Hughes, then discussed his decision with other employees in the yard. Provost Aff. [36-3] at 4; *see also* Willie Miller Aff. [36-4] at 2. In short, Wright has failed to point to a similarly situated individual who was treated more favorably under nearly identical circumstances, so his disparate-discipline allegations do not make it past the prima facie stage.

2. Discriminatory Discharge

Wright also advances a discriminatory-discharge claim—insisting that CEI's reasons for firing him are untrue and his termination was due to his age and race. It is undisputed that Wright was replaced by Hughes, who is white and under the age of 40, and CEI assumes for summary judgment purposes that he can make out a prima facie case of discrimination. CEI maintains that it fired Wright after three disciplinary instances—a legitimate, nondiscriminatory reason.[6]

To withstand the motion for summary judgment as to his race-discrimination claims, Wright "must offer evidence sufficient to raise a genuine issue of material fact as to either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext

---

[6] The Court notes that Provost fired Hughes a few months after Wright was terminated and put Miller, who is African-American, in the position.

alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive alternative)." *Rachid*, 376 F.3d at 312. While Plaintiff does not explicitly state which approach he is taking, based on his insistence the CEI's reasons for firing him are "false," the Court presumes he has chosen the pretext route. Pl.'s Resp. at 1, 2. Similarly, to move forward on his age-discrimination claim, Wright "must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross*, 557 U.S. at 176; *see also Davis*, 372 F. App'x at 519.

Generally, "[p]retext can be established by showing disparate treatment or that the '[legitimate] explanation is false or unworthy of credence.'" *Assariathu v. Lone Star Health Mgmt. Assocs., L.P.*, No. 12-10730, 2013 WL 1150021, at *3 (5th Cir. Mar. 6, 2013) (quoting *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011)). Plaintiff's Response is disorganized and repetitive, but the Court gleans the following arguments in support of his claim of discrimination: (1) CEI admitted that Wright did not engage in misconduct during the MDES hearing (p. 9); (2) white employees were treated more favorably than similarly situated African-American employees (p. 16); (3) CEI did not follow its own policies and procedures in disciplining Cole, Wright, and Hughes (p. 17); and (4) CEI's reason for terminating Wright is not credible because he did not engage in insubordination (p. 21). The Court will examine each.

Wright begins by repeatedly arguing that CEI is precluded from asserting that he was terminated for insubordination because it chose not to contest his application for unemployment benefits before the MDES. This argument fails for three reasons. First, the MDES hearing transcript reflects that George Lockart, owner of CEI, chose not to contest Wright's application for unemployment benefits, but noted that CEI intended to defend the discrimination charges

8

before the EEOC. Pl.'s Resp., Hr'g Tr. [41-4] at 8–10. Second, state administrative decisions do not have preclusive effect as to claims for which Congress provided a detailed administrative remedy, such as Title VII and ADEA claims. *See Smith v. Koch Foods of Miss., LLC*, 3:09CV668 DPJ-FKB, 2011 WL 2415336, at *2, n.1 (S.D. Miss. June 13, 2011) (rejecting estoppel argument related to unemployment compensation ruling); *see also Moore v. Shearer-Richardson Mem. Nursing Home*, 1:10CV170B-S, 2012 WL 1066340, at *3 (N.D. Miss. Mar. 28, 2012) (citing *Cox v. DeSoto Cnty., Miss.*, 564 F.3d 745, 748–49 (5th Cir. 2009) ("The parties concede, under Supreme Court authority, that collateral estoppel does not apply to state administrative decisions where Congress has provided for a detailed administrative remedy such as that found in the Age Discrimination in Employment Act (ADEA).")). Finally, the issues in an unemployment contest are different from those under Title VII. *See generally Black v. W. Panola Sch. Dist.*, 461 F.3d 584, 588–89 (5th Cir. 2006); *Evans v. Shapley*, 607 So. 2d 1210, 1213 (Miss. 1992).

As to the disparate-treatment argument, as discussed above, Wright has not offered a proper comparator for the Court to consider. The only co-workers Wright points to are Hughes and Cole—both of whom engaged in dissimilar misconduct. And it bears repeating—Cole held a different position and received harsher discipline than Wright. *See Lee*, 574 F.3d at 260.

Similarly, Wright has not presented record evidence to support his third argument that CEI did not follow its own policies in disciplining Hughes and/or Cole. First, assuming CEI ignored its policies, the Fifth Circuit has held that "'[a] defendant's failure to follow its own policy is not probative of discriminatory animus in absence of proof that the plaintiff was treated differently than other non-minority employees because Title VII does not protect employees from

9

the arbitrary employment practices of their employer, only their discriminatory impact.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007) (quoting *Upshaw v. Dallas Heart Grp.*, 961 F. Supp. 997, 1002 (N.D. Tex. 1997)); *see Laxton v. Gap, Inc.*, 333 F.3d 572, 581 n.3 (5th Cir. 2003) (noting that an employer's disregard of its policies alone does not conclusively establish pretext); *see also Hall v. Smurfit-Stone Container Enters., Inc.*, Civ. Action No. 3:07CV0501-G, 2008 WL 3823252, at *4 (N.D. Tex. Aug. 14, 2008) (applying *Turner* in the age discrimination context).

But, even putting that aside, the Driver's Handbook presented by CEI does not support Wright's assertions, without proof, that Cole should have been terminated for the altercation. The handbook characterizes "[p]hysical violence directed at any fellow employee" as a Level 3 violation, which "*may* result in immediate termination of employment." Defs.' Mot., Handbook [36-8] at 3, 6 (emphasis added). CEI had discretion whether to fire Cole following the altercation; it chose not to. CEI also points out that, under the handbook, Provost was actually more lenient with Wright after the first incident of insubordination than he should have been and Wright's termination was consistent with the policy. "Insubordination toward supervisor" is a Level 2 violation; the first Level 2 violation consequence is three days off without pay, and the second Level 2 violation "will result in termination." *Id.*[7] And as to Hughes, as discussed above, Wright has not presented any evidence that Hughes escaped disciplinary action for purportedly sleeping on the job—this argument is merely speculation.

---

[7] Wright received a written warning, rather than the recommended three-day suspension. *See* Progressive Disciplinary Report [36-7] ("Second Disciplinary Action").

Finally, Wright argues that CEI's given reasons for terminating him are not credible, but he has not produced evidence to support this assertion. As to the first disciplinary action based on Wright's failure to immediately notify Provost of the Cole altercation, Wright testified that he reported the incident to Waste Management, even though none of its employees were involved, before contacting Provost. Wright Dep. [36-2] at 40. As to the second disciplinary action for insubordination, Wright admitted in his deposition that he went to Provost and told him he believed it was "wrong" to let Hughes fill-in on the loader, instead of Miller. Wright Dep. [36-2] at 20–21. Wright denied getting upset with Provost, but acknowledged that he went back to the yard and talked to Miller about it. *Id.* at 22. Wright stated: "I told [Miller], I said, well, I did talk to John [Provost], and John said that's the way things are going to be. And he told me he'll do anything he wanted. He run it the way he wanted. And I said, well, I can't do nothing about it." *Id.* at 22; *see also* Pl.'s Response, Wright Dep. [41-1] at 14–15.

As to the third disciplinary action, Wright denies that he continued to question Provost's decision to other employees in the yard. But the relevant inquiry is whether Provost reasonably believed that Wright was questioning his authority and acted on that belief in good faith. *See Jackson v. Cal–Western Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) ("In cases in which an employer discharges an employee based on the complaint of another employee, the issue is not the truth or falsity of the allegation, but whether the employer reasonably believed the employee's allegation and acted on it in good faith.") (internal quotations omitted). CEI has presented evidence suggesting that he did. Provost stated in his declaration that Hughes informed him that Wright had been "constantly pestering and questioning [him] regarding how he had gotten a job with CEI" and had been "telling the other employees on the yard that

11

[Provost]" had "no right to put Mr. Hughes on the track hoe and loader." Provost Decl. [36-3] at 4–5.[8]

The Fifth Circuit considered a similar situation in *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d at 379. There, the employer fired the plaintiff for sexual harassment, and he sued, claiming age discrimination. The plaintiff attempted to show pretext by arguing that he did not commit sexual harassment. But the Court noted that the employer "was faced with considerable evidence that [he] was violating the company's sexual harassment policy," including accounts from several employees and internal and external investigation reports. Rejecting the plaintiff's argument, the Court affirmed summary judgment in favor of the employer and explained:

> [The plaintiff's] own conclusory assertion that he did not behave inappropriately is irrelevant, since he has provided no evidence to suggest that [the employer's] decision to trust the results of the two investigations, rather than his self-serving denial of wrongdoing, was unreasonable or in bad faith. [The plaintiff's] assertion of innocence alone does not create a factual issue as to the falsity of [the employer's] proffered reason for terminating him.

*Id.*

Wright may insist he did not undermine Provost, but CEI has produced evidence that Provost had a reasonable belief that Wright continued to question his decision with respect to Hughes and acted on it in good faith. *Miller v. Metro Ford Auto. Sales, Inc.*, No. 12-60549, 2013

---

[8] Miller also stated in his declaration that he "witnessed Mr. Sylvester Wright disrupting the yard and questioning Mr. Provost's authority, both to Mr. Provost and to others. This included questioning Mr. Provost's hiring of David Hughes." Miller Decl. [36-4] at 2; *see also* Miller Dep. [36-5] at 5 (testifying that he heard from "guys on the yard" that Wright had questioned Provost about replacing him with Hughes); Miller Dep. [43-2] at 2–3 (testifying that Wright, on more than one occasion, was talking to "all the guys" on the yard about Miller being replaced by Hughes). While it is not clear that Miller relayed this information to Provost, this evidence supports CEI's position that Wright was undermining Provost in the yard.

WL 1150034, at *2 (5th Cir. Mar. 20, 2013) (affirming summary judgment and noting that even if the employer mistakenly assumed that the plaintiff violated company policy, that mistake is insufficient to demonstrate that the employer's stated reason for termination was pretext); *Jackson*, 602 F.3d at 379 (explaining that a plaintiff's assertion of innocence relating to the stated reason for termination does not create a factual issue as to the falsity of that reason because the issue is not the truth or falsity of the plaintiff's wrongdoing, but rather whether the employer believed the plaintiff was at fault and acted upon that belief in good faith). As often stated, the Court should not "engage in second-guessing of an employer's business decisions." *LeMaire v. La. Dept. of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) (citing *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("Management does not have to make proper decisions, only non-discriminatory ones.")).

In sum, Wright has not met his burden to show by a preponderance of the evidence that CEI's proffered reason for his termination is pretext for discrimination. Summary judgment as to his discriminatory-discharge claim is in order.

B. Retaliation

Wright's retaliation claims do not make it past the prima facie stage. To establish a prima facie case of retaliation, a plaintiff must show (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) there was a causal link between the protected activity and the adverse employment action. *Hernandez v. Yellow Transp., Inc.*, 641 F.3d 118, 129 (5th Cir. 2011). An employee has engaged in protected activity if he has either (1) opposed any practice made unlawful by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. *Long v. Eastfield*

13

*Coll.*, 88 F.3d 300, 304 (5th Cir. 1996); *see also Hernandez v. Crawford Bldg. Material Co.*, 321 F.3d 528, 531 n.1 (5th Cir. 2003) ("This court has held that analysis of retaliation claims is the same for ADEA claims as it is for Title VII claims."). "An employee's informal complaint to an employer may constitute participation in a protected activity, provided that the complaint is in opposition to conduct that is unlawful, and the employee holds a good faith, reasonable belief of the conduct's unlawfulness." *Clark v. Chickasaw Cnty., Miss*., No. 1:09CV192–SA–JAD, 2010 WL 3724301, at *3 (N.D. Miss. Sept. 16, 2010) (citations and quotation omitted); *see also Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (noting a plaintiff must show she had a "reasonable belief that the employer was engaged in unlawful employment discrimination"). "Complaints to employers that do not complain of conduct protected by Title VII do not constitute protected activities under the statute." *Clark*, 2010 WL 3724301, at *3 (citation and internal quotation marks omitted). Wright cannot meet the first prong because his statements did not make it clear that he was complaining about discrimination.

Wright claims that he was retaliated against for (1) protesting his suspension in September 2010 and (2) opposing the perceived demotion of Willie Miller. Compl. ¶ 13. But according to Wright's own testimony, he never mentioned discrimination, race, or age while voicing his complaints. On the issue of his suspension, Wright testified that he told J.J. Barnes, "I didn't think it was right." Wright Dep. [36-2] at 53. But he denied telling Barnes that he thought the suspension was because of his race or age. *Id.* at 54.

Likewise, Wright perceived the hiring of Hughes as a demotion for Miller and told Provost he thought it was "wrong," but there is no evidence suggesting that he mentioned race,

14

age, or discrimination. Wright explained why he voiced opposition to the decision in his deposition:

> A. Because he hadn't discussed it with me. And he told me that I was over the yard. Now, you going to do something another and put me in charge of something another, I think they should have come and talked to me before he made any decision about that there.
> Q. All right. So you took offense to that?
> A. No, I didn't take offense to it. I just went and told him that I feel like that was wrong.
> Q. You didn't like it, did you?
> A. It ain't the idea that I didn't like it. It's the idea that I felt like it was wrong, and that was it.
> Q. All right. So you told him that you thought it was wrong?
> A. Yeah.

*Id.* at 20–21.

Plaintiff stresses that he is uneducated. While an employee is not expected to use precise legal terms, Wright has not shown that he put his employer on notice that his complaint was based on discrimination. Because Wright has not presented evidence that his complaints referenced race and/or age-based discrimination, he has not demonstrated that he engaged in protected conduct. *See Tratree v. BP N. Am. Pipelines, Inc.*, 277 F. App'x 390, 396 (5th Cir. 2008) (finding no protected activity because plaintiff's complaint of unfair treatment never referred to the discriminatory treatment as age-based); *Turner*, 476 F.3d at 349 (affirming summary judgment on retaliation claim where the plaintiff's email focused on a workplace incident and "the deteriorating relationship" between the plaintiff and her supervisor and did not mention race); *Harris–Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006) (holding that plaintiff did not engage in protected activity when she never "mentioned that

15

she felt she was being treated unfairly due to her race or sex"). Summary judgment on Wright's retaliation claims is appropriate.[9]

C. State Law Claims

In addition to discrimination claims, Wright references various state-law claims in his Complaint, including tortious breach of contract, wrongful discharge, and intentional infliction of emotional distress. For the reasons explained below, the Court finds these claims should also be dismissed.

1. Termination of Employment

In Count IV of his Complaint, Wright alleges that Defendants' conduct constituted a tortious breach of contract and wrongful discharge. Compl. [1] ¶ 36. Mississippi has long recognized the employment-at-will doctrine. *See Kelly v. Miss. Valley Gas Co.*, 397 So. 2d 874, 874 (Miss. 1981). "[A]bsent an employment contract expressly providing to the contrary, an employee may be discharged at the employer's will for good reason, bad reason, or no reason at all, excepting only reasons independently declared legally impermissible." *Shaw v. Burchfield*, 481 So. 2d 247, 253–54 (Miss. 1985).

There are two narrow exceptions to this rule. First, in *McArn v. Allied Bruce–Terminix Co.*, the Mississippi Supreme Court held that the employment-at-will doctrine does not apply when an employee is discharged because he or she refused to participate in an illegal activity or has reported the illegal activity of his employer. 626 So. 2d 603, 607 (Miss. 1993). Defendants submit that *McArn* is inapplicable because Wright has not presented any evidence that he

---

[9] Because the Court finds that Wright has not shown he engaged in protected conduct, it need not address his proximity-in-time argument.

complained of, or refused to participate in, criminal conduct, and the Court agrees. *See Hammons v. Fleetwood Homes of Miss., Inc.*, 907 So. 2d 357, 360 (Miss. Ct. App. 2004) (noting that for the exception to apply, "the acts complained of [must] warrant the imposition of criminal penalties, as opposed to mere civil penalties"); *see also Kyle v. Circus Circus Miss., Inc.*, No. 10–60571, 2011 WL 1659514, at *4 (5th Cir. Apr. 28, 2011) (following *Hammons* and limiting *McArn* to acts that relate to criminal, not civil, penalties); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 404 (5th Cir. 2005) (same); *Bruno v. RIH Acquisitions MS I, LLC*, No. 2:06CV163, 2008 WL 152124, at *4 (N.D. Miss. Jan. 14, 2008) (same).

Second, Wright argues that the employee handbook created an employment contract, which CEI breached by failing to comply with its policies regarding employee discipline. This claim is not apparent in his Complaint and is otherwise insufficient. Wright relies on *Bobbitt v. The Orchard, Ltd.*, but that reliance is misplaced. 603 So. 2d 356 (Miss. 1992). In *Bobbitt*, the court carved out a second exception, holding that "when an employer furnishes its employees a handbook or manual that sets forth procedures to be followed in reprimanding, suspending, or discharging its employees, then the employer is obligated to follow its own provisions, even in the absence of a formal employment contract." *Crawford v. Bannum Place of Tupelo*, No. 3:10CV54-SA-DAS, 2013 WL 104963, at *3 (N.D. Miss. Jan. 8, 2013) (citing *Bobbitt*, 603 So. 2d 356). But the employer may avoid creating an employment contract by including a disclaimer stating that employment remains "at-will." *Id.* CEI's handbook contains such a disclaimer.

Defs.' Rebuttal, Exh. CC, Handbook [43-3] at 2.[10]  Alternatively, even assuming a contract was created by the handbook, Wright has not produced evidence that CEI breached it.

    2.    Intentional Infliction of Emotional Distress[11]

In his Complaint, Wright generally asserts that "as a result of the acts of Defendants" he suffered emotional distress. Compl. [1] ¶ 43; *see also id.* ¶ 45 (claiming Defendants "engaged in certain conduct that evokes outrage or revulsion . . . that entitle Plaintiff Wright to damages for mental and emotional distress"). But "meeting the requisites of a claim for intentional infliction of emotional distress is a tall order in Mississippi," *Riley v. F.A. Richard & Assocs.*, 16 So. 3d 708, 719 (Miss. App. 2009) (citations omitted), and such claims "will not ordinarily lie for mere employment disputes," *Nuwer v. Mariner Post–Acute Network*, 332 F.3d 310, 316 (5th Cir. 2003) (quoting *Lee v. Golden Triangle Planning & Dev. Dist., Inc.*, 797 So. 2d 845, 851 (Miss. 2001)). "[O]nly where the conduct has been so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" will courts impose liability. *White v. Walker*, 950 F.2d 972, 978 (5th Cir. 1991) (applying Mississippi law). Finally, "mere insults, indignities, threats, annoyances, petty oppression or other trivialities" are not actionable in Mississippi. *Jenkins v.*

---

[10] In addition to asserting that the handbook created a contract of employment, Wright simultaneously maintains that he "was not provided the progressive discipline that governed his employment." Pl.'s Resp. [42] at 25. Assuming that is the case, he would not fall under the exception set forth in *Bobbitt*. 603 So. 2d. at 361 ("We hold in this case that *because the manual was given to all employees*, it became a part of the contract.") (emphasis added)

[11] CEI did not specifically address the intentional infliction of emotional distress claim in its motion, but did move for summary judgment as to all claims. Plaintiff discussed the claim in his Response, and CEI presented its counter-arguments in its Reply. Though not ideal, both parties have had an opportunity to brief the claim.

*City of Grenada, Miss.*, 813 F. Supp. 443, 447 (N.D. Miss. 1993) (quoting Restatement (Second) of Torts § 46 cmt. d. (1965)); *see also Davis v. AltaCare Corp.*, No. 2:05cv2027, 2007 WL 2026438, at *8 (S.D. Miss. July 9, 2007).

Wright objects to the fact that he was suspended and later terminated by CEI, but the conduct was neither outrageous nor extreme. The facts, when viewed in a light most favorable to Wright, present a garden-variety employment dispute for which Mississippi law recognizes no cause of action. Wright's intentional-infliction-of-emotional-distress claim is dismissed.[12]

IV. Conclusion

The Court has considered all issues raised by the parties, and those not expressly addressed herein would not change the result of this Order.

Based on the foregoing, the Court finds Defendants' motion for summary judgment should be granted. This action is dismissed with prejudice.

A separate judgment will be entered in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED** this the 19th day of April, 2013.

                                               s/ *Daniel P. Jordan III*
                                               UNITED STATES DISTRICT JUDGE

---

[12] In his Complaint, Wright also mentions "working in a hostile work environment." Compl. ¶ 10. But he does not allege a separate claim for hostile work environment or harassment under the discrimination statutes, he did not develop any such claim in his briefing, and grounds for a hostile work environment or harassment claim are not apparent from the facts alleged in his Complaint.